**In re COPPER MOUNTAIN SE-CURITIES LITIGATION.**

**No. C–00–3894 VRW.**

United States District Court,
N.D. California.

Feb. 10, 2004.

---

Francis M. Gregorek, Esq., Wolf Haldenstein Adler Freeman & Herz LLP, San Diego, CA.

Betsy C. Manifold, Esq., Wolf Haldenstein Adler Freeman & Herz LLP, San Diego, CA.

Francis A. Bottini Jr., Esq., Wolf Haldenstein Adler Freeman & Herz LLP, San Diego, CA.

Lawrence G. Soicher, Esq., Law Offices of Lawrence G. Soicher, New York City.

William E. Grauer, Esq., Cooley Godward LLP, San Diego, CA.

Philip C. Tencer, Esq., Cooley Godward LLP, San Diego, CA.

Daniel A. Osborn, Esq., Beatie & Osborn, LLP, New York City.

Eduard Korsinsky, Esq., Beattie and Osborn LLP, New York City.

Patrick J. Coughlin, Esq., Milberg Weiss Bershad Hynes & Lerach LLP, San Francisco, CA.

Lesley E. Weaver, Esq., Milberg Weiss Bershad Hynes & Lerach LLP, San Francisco, CA.

James E. Miller, Esq., Scott & Scott, LLC, Colchester, CT.

### ORDER

WALKER, District Judge.

At the end of many fairy tales, Prince Charming vanquishes the villain, rescues the damsel in distress and all live "happily ever after." A class representative suing to rescue distressed plaintiffs may sometimes appear to be a prince. But, in reality, the heroic prince, perhaps, is actually a frog. This order, the subsequent case history of *In re Cavanaugh*, 306 F.3d 726 (9th Cir.2002), tells just such a tale.

I

A

The background of the story is already quite familiar. Two individuals and one

group comprising five individuals sought to be appointed as lead plaintiff in this consolidated securities class action. Each of these seven individuals submitted declarations in response to the court's February 5, 2001, order (Doc # 44). That order solicited responses to ten questions regarding plaintiffs' efforts to obtain competent counsel and to negotiate a reasonable fee arrangement. Also, each individual attended a hearing on March 8, 2001. The prospective plaintiffs told the court in person about their qualifications and interests in representing the class.

The first proposed lead plaintiff, William A Chenoweth, was a fifty year old certified public accountant residing in Birmingham, Alabama. Chenowith had an undergraduate degree in computer science from Vanderbilt University, as well as an MBA from Brigham Young University. Chenoweth asserted that he had read several news reports and objective analyses regarding the transactions at issue in this matter and was thus prepared to direct lead counsel regarding investigation and other litigation preparation. Chenoweth had not negotiated a fee arrangement with any proposed class counsel and stated that he would undertake such negotiations should he be appointed lead plaintiff. Chenoweth's damages were estimated to be approximately $295,000. See Decl Ryan M Hagan (Hagan Decl; Doc # 28) at ¶ 4.

The second proposed lead plaintiff, Quinn Barton, had originally been one of ten individuals comprising a group seeking lead plaintiff appointment as the Prendergast group. Only Barton, however, still sought to be so appointed at the time of the hearing. Barton was a self-employed investor residing in Jacksonville, Florida. Barton received an MBA from George Washington University and worked on Wall Street for approximately ten years, much of that time as a commercial bond trader. Once Barton decided to become involved in this litigation, he contacted Beattie & Osborn LLP in New York and negotiated a descending percentage fee arrangement with percentages ranging from 15% down to 10% and related caps as follows:

| Recovery | Fee Percentage | Cap |
|---|---|---|
| $0–$20,000,000 | 15% | $2,000,000 |
| $20,000,001$–40,000,000 | 12% | $4,000,000 |
| $40,000,001 + | 10% | $8,000,000 |

Under the arrangement, the attorney fee would be calculated depending on the tier into which total recovery fell. For example, a $15,000,000 recovery would generate a fee based on 15% of the recovery, $2,250,000, which would then be reduced by the cap to $2,000,000. A $35,000,000 recovery, on the other hand, would trigger a calculation under the second tier and generate a fee of $4,200,000 (12% of $35,000,000), which would be reduced by the second tier's cap down to $4,000,000. The arrangement would also award expenses incurred by counsel from the recovery fund before the fee was computed. Barton purchased only 1,000 shares during the class period; his damages from these purchases were calculated to be approximately $59,000. See PG Mot Lead Pl (Doc # 25), Exh A at 2.

The "Copper Mountain Investors" (CMI), a group of five individuals represented by Milberg Weiss Bershad Hynes & Lerach (Milberg Weiss), was the final proposed lead plaintiff. The group was comprised of David Cavanaugh, Michael P Hannon, Richard Weiss, Raymond Pfeifer and Robert A Herrgott. These individuals asked the court to appoint them as a group primarily based on their assertion that, as a group, they brought a wider range of personalities, skills and decision-making abilities to the lead plaintiff role.

The member of the CMI group with the greatest loss was Cavanaugh. Cavanaugh was a retired vice president of sales for a large international company. Cavanaugh had obtained an undergraduate degree in business administration. Although he did not seek out other law firms before deciding to retain Milberg Weiss, Cavanaugh represented that he conducted some preliminary research that persuaded him to contact that firm. Cavanaugh's damages were estimated to be approximately $943,000. Decl Lesley W Weaver (Weaver Decl; Doc # 53), Exh A at 1.

Hannon was a certified public accountant and a business broker residing in Minneapolis. In the past, Hannon had served on behalf of a bankruptcy court in various capacities for bankruptcy filings. Hannon stated that he contacted and interviewed lawyers from at least eight law firms in the process of determining which counsel to hire. After much research, Hannon decided to hire Milberg Weiss based on the recommendations of others and his own assessment of the firm's abilities. Before agreeing to retain Milberg Weiss, Hannon discussed potential fee arrangements with the firm. Hannon's damages were estimated to be approximately $765,000. *Id.* at 4.

Weiss was a commercial real estate developer residing in Phoenix, Arizona. Weiss had received an undergraduate degree in business and had served as an expert witness in complex real estate trials. Weiss asserted that his daily job required extensive and continuous negotiations with architects, engineers, contractors and other individuals involved in the business. Weiss initially contacted another law firm before being referred to Milberg Weiss. The losses incurred by Weiss were calculated to be about $633,000. *Id.*

Pfeifer was a senior vice president of corporate marketing at a high tech company in Silicon Valley. As with others in the CMI group, Pfeifer had a business background. Pfeifer's damages were estimated to be about $524,000. *Id.*

Finally, Herrgott was both the president of a construction company and a broker. Herrgott lived in Michigan and had received an MBA from Wayne State University in Detroit. Herrgott was also a chartered financial analyst, which he stated provided him with a working knowledge of accounting-related principles. Herrgott claimed that he had extensive experience trading stocks. The losses incurred by Herrgott were calculated to be approximately $462,000. *Id.*

These five individuals negotiated with Milberg Weiss as a group for the following ascending percentage fee arrangement:

| Recovery | Fee Percentage |
| --- | --- |
| $0–$10,000,000 | 20% |
| $10,000,001–$25,000,000 | 25% |
| $25,000,001 + | 30% |

Under the agreement, all expenses were to be covered by the firm.

The docket sheet also shows that Ariel Hernandez, the plaintiff who brought the first-filed case, also sought designation as lead plaintiff. Hernandez did not, however, pursue appointment.

B

On April 12, 2001, the court concluded that Barton should be appointed as lead plaintiff in this case. Doc # 74. The court's decision on that issue is reported as *In re Quintus Sec Litig.*, 201 F.R.D. 475 (N.D.Cal.2001) (*Quintus I*). The court discussed the requirements of the Private Securities Litigation Reform Act (PSLRA), 15 USC § 78u–4, which provides that the court " 'shall appoint as lead plaintiff the member or members of the pur-

ported plaintiff class that the court determines to be most capable of adequately representing the interests of class members * * *.'" *Quintus I*, 201 F.R.D. at 481, quoting 15 USC § 78u–4(a)(3)(B)(i); see also 15 USC § 77z–1(a)(3)(B)(i). The court found that, based on the magnitude of their claimed losses, each member of the CMI group was entitled to the presumption that they would be the most adequate lead plaintiffs. *Quintus I*, 201 F.R.D. at 487. That presumption, however, is a rebuttable one, the court explained; and the presumption is primarily meant to favor those investors that are better equipped to serve as lead plaintiffs. *Id.* The court believed—with a naivete that must seem quaint in appellate circles—that investors would desire economical, as well as effective, legal representation. On this ground, the court found that the presumption had been rebutted in this case because the CMI group failed to demonstrate that the fee arrangement it negotiated with Milberg Weiss was competitive, given that the Milberg Weiss fees were "comparative[ly] extravagan[t]" in relation to the fees under Barton's agreement with Beattie & Osborn. *Id.* Chenoweth had failed entirely to negotiate a fee arrangement. *Id.* at 487. Thus, the court determined that Barton's fee arrangement was the most favorable and concluded that Barton should be appointed as lead plaintiff. *Id.* at 489. The court further explained its rationale for choosing Barton on the basis of the fee agreement in *In re Quintus Sec. Litig.*, 148 F.Supp.2d 967 (N.D.Cal.2001) (*Quintus II*), issued on May 31, 2001. Doc # 77.

Dissatisfied with the court's *Quintus* orders, the CMI group petitioned the Ninth Circuit for a writ of mandamus, arguing that it should have been appointed lead plaintiff, rather than Barton. See Doc # 105. On September 16, 2002, a panel of appellate judges, finding that the court

only "*purport[ed]* to apply the [PSLRA]," overruled the court's decision to appoint Barton as lead plaintiff. *In re Cavanaugh*, 306 F.3d 726, 728 (9th Cir.2002) (emphasis added). The Ninth Circuit admonished the court that "freewheeling comparison of the parties competing for lead plaintiff" is improper and that the only basis for comparison between the plaintiffs should be their financial stake in the litigation. *Id.* at 732. Once the individual or group with the largest stake is identified, the panel said, "further inquiry must focus on that plaintiff alone and be limited to determining whether [it] satisfies the other statutory requirements [of typicality and adequacy]." *Id.* The appellate panel further advised that the court's assessment that another plaintiff would do a better job of class representation is simply of no consequence. *Id.* Courts have no business engaging in a "beauty contest," selecting "the best possible lawyer or the lawyer offering the best possible fee schedule." *Id.* at 732. Courts must rise above the marketplace unless "the presumptive lead plaintiff's choice of counsel is so irrational, or so tainted by self-dealing or conflict of interest as to cast genuine and serious doubt on that plaintiff's willingness or ability to perform the functions of lead plaintiff." *Id.* at 733. Hence, the Ninth Circuit panel ordered that the court vacate its order appointing Barton as lead plaintiff and proceed under the assumption that the CMI group had made a prima facie showing that satisfied Rule 23. *Id.* at 739.

*Cavanaugh* would seem to establish that the largest stakeholder's selection of counsel must be approved unless that selection is either mad or crooked. The appellate court thus turned back price and quality competition in selection of securities class action counsel, save as might be achieved by the lead plaintiff and the court through

ex post review of fees. As regards these two methods of protecting the class, *Cavanaugh* prompts no little irony. The 1995 securities acts amendments were spurred by Congress' concern that lawyers were in the class action driver's seat. See S Rep 104–98, 1995 USCCAN 679, 685. Yet, under *Cavanaugh,* these amendments become a straightjacket against judicial measures to ensure that such actions genuinely benefit investors, not just lawyers. This irony compounds in the face of recognition—at least elsewhere—that ex post judicial review of fees affords only feckless protection of the class. *In re Synthroid Marketing Litig.,* 264 F.3d 712, 718 (7th Cir.2001) ("The best time to determine [reasonable fees] is at the beginning of the case, not the end (when hindsight alters the perception of the suit's riskiness, and sunk costs make it impossible for lawyers to walk away if the fee is too low)").

## C

But ho! The story does not end here. The court anticipated that the CMI group and its attorneys, which had fought the court's *Quintus* orders with the strength of Achilles, would continue to fight the battle on behalf of Copper Mountain investors with vigor and passion. Alas, the hero appears to have vanished—fled the scene—gone south—maybe vaporized.

The court received a letter dated November 17, 2003, from Barton's attorney Daniel Osborn. Doc # 125. Osborn informed the court that he had learned from Milberg Weiss that the CMI group had recently instructed Milberg Weiss not to pursue further appointment of a lead plaintiff. Osborn subsequently provided the court with a copy of a letter that he received from Patrick Coughlin, a Milberg Weiss attorney. Doc # 127. In that letter, Coughlin stated that the court "had failed to take any action consistent with the Ninth Circuit's ruling" and that, as a result of the passage of time, the CMI group no longer wished to pursue appointment as lead plaintiff. *Id.*

Parties and their lawyers who win in the court of appeals and secure a remand are generally quite hot to trot once back in the trial court. It was surprising to learn that the CMI group had lost interest before the resumption of proceedings in this case. The court is unaware of any request by the CMI group to set a status conference following remand. The devotion of the CMI group, envisioned by the Ninth Circuit as the "most adequate plaintiff" to stand up for defrauded fellow investors, had withered away by the passage of time. By vindicating their "right" to be the presumptive lead plaintiffs through the extraordinary remedy of mandamus (and establishing circuit precedent of no little value to their lawyers), the CMI group might seem to possess a tenacity and determination seldom seen on the battlegrounds of federal litigation. But what might seem apparently is not. Could there have been some motivation other than vindicating the interests of defrauded investors behind the mandamus proceedings? Could it be that the Ninth Circuit panel, perceiving the black letter of the PSLRA, was actually reading a fairy tale?

After receipt of the letter from Osborn, the court scheduled a status conference with the parties for Monday, December 8, 2003. Doc # 126. At the December 8 conference, the only parties represented were Barton and defendants. Attorneys for no other plaintiffs appeared. When the court expressed its puzzlement at these failures to appear, Osborn informed the court that he had faxed the notice of the status conference to representatives for all interested parties, including Milberg Weiss. Subsequently, Osborn provided the court with a copy of the fax he sent to

Milberg Weiss. Doc # 130. It thus appears that Milberg Weiss received actual notice of the status conference.

Not wanting to deny the CMI group its day in court, the court issued an order dated December 17, 2003, informing Milberg Weiss (along with Chenowith and counsel for Hernandez) that the court had held the conference as scheduled and that, from their absence, the court inferred that the CMI group (as well as Chenowith and Hernandez) were not interested in pursuing appointment as lead plaintiff in the case. Doc # 129. The court directed those parties to inform the court in writing not later than December 24, 2003, if they continued to seek appointment as lead plaintiff. *Id.* In response, the court received a letter dated December 24, 2003, from Hernandez' counsel, informing the court that counsel had been unable to consult with Hernandez to determine whether Hernandez would seek appointment as lead counsel. Although more than a month has passed, the court has received nothing further from Hernandez, nor from any of the other parties to whom the order was directed. Interestingly, the court has received no response whatsoever from Milberg Weiss on behalf of the CMI group.

None of the parties in attendance at the December 8, 2003, hearing furnished a reason or professed to know why the Milberg Weiss office did not attend. And Milberg Weiss has provided no subsequent explanation to the court pursuant to the December 17, 2003, order.

## II

In the wake of the decision of the Ninth Circuit to remove Barton as lead plaintiff and the unexplained abandonment of the case by the CMI group, the court is left in something of a predicament.

### A

First, given that no other plaintiff but Barton indicates an interest at the present time to serve as lead plaintiff, he once again appears to be the logical choice (and now the only one). In the *Cavanaugh* decision, the Ninth Circuit laid out a three-step process for identifying the lead plaintiff pursuant to the statutory criteria. Of course, the continuing vitality of the *Cavanaugh* test may be questioned in light of recent amendments to FRCP 23. Under the PSLRA, the presumptive "most adequate plaintiff" must satisfy "the requirements of Rule 23." See 15 USC § 77z–1(a)(3)(B)(iii)(I)(cc); 15 USC § 78u–4(a)(3)(B)(iii)(I)(cc). Rule 23 now permits the court to direct class counsel "to propose terms for attorney fees and nontaxable costs." FRCP 23(g)(1)(C)(iii). Notwithstanding the uncertainty of reconciling the *Cavanaugh* test with this development, the court will punctiliously apply *Cavanaugh*.

Step one in the *Cavanaugh* process is verification of the proper posting of a "notice 'in a widely circulated national business-oriented publication or wire service.'" *Cavanaugh,* 306 F.3d at 729, quoting 15 USC § 78u–4(a)(3)(A)(i). Step two is the court's consideration of "the losses allegedly suffered by the various plaintiffs before selecting as the 'presumptively most adequate plaintiff'—and hence the presumptive lead plaintiff—the one who 'has the largest financial interest in the relief sought by the class' * * *. In other words, the district court must compare the financial stakes of the various plaintiffs and determine which one has the most to gain from the lawsuit." *Cavanaugh,* 306 F.3d at 729–30, quoting 15 USC § 78u–4(a)(3)(B)(iii)(I). Step three is the opportunity for plaintiffs not found to be the presumptive lead plaintiff to rebut the presumptive lead plaintiff's showing in satis-

faction of the adequacy and typicality requirements for lead plaintiff designation. *Cavanaugh*, 306 F.3d at 730. The more measured, but still fundamentalist, reading of the PSLRA by the Third Circuit in *In re Cendant Corp. Litig.*, 264 F.3d 201, 266 (3d Cir.2001), found that the possibility of judicial scrutiny over the selection of class counsel is not fully foreclosed, if nonetheless highly circumscribed. But since the *Cavanaugh* decision establishes the law of this case, the court now follows it dutifully.

The parties agreed at the December 8, 2003, hearing that the first *Cavanaugh* requirement of notice was not at issue at this time. The court therefore begins with the second step of *Cavanaugh*, which deals with who has the largest financial stake in the litigation. At this point, being the only individual still petitioning for appointment as lead plaintiff, Barton by default has the greatest financial stake in the case and is the presumptive lead plaintiff. The court has explained in detail in its previous orders why Barton satisfies the adequacy requirements imposed by FRCP 23(a), and there is no reason to believe that Barton does not continue to satisfy those requirements. As to step three of *Cavanaugh*, by the December 8 status conference and subsequent notice to the other proposed lead plaintiffs, the court gave other prospective lead plaintiffs in this case ample opportunity to contest Barton's appointment as lead plaintiff. None has chosen to present arguments that might persuade the court that appointing Barton would be a mistake.

Accordingly, the court once again GRANTS Barton's application to serve as lead plaintiff in this case and approves Barton's choice of Beattie & Osborn to serve as lead counsel. So the litigation is now back to where it was almost three years ago.

## B

Second, the court must determine the schedule for further proceedings. Defendants had filed on August 9, 2001, a motion to dismiss the consolidated complaint. Doc # 81. The motion was amended on August 13, 2001. Doc # 85. Barton filed an opposition to this motion on September 24, 2001 (Doc # 90), which was amended the following day (Doc # 91). Defendants filed a reply on September 15, 2001. Doc # 95. The court held a hearing on the motion to dismiss on November 29, 2001. Doc # 103. Due to the mandamus proceedings, the motion was terminated on March 19, 2002. Doc # 113. On August 27, 2002, the court also stayed the case pending resolution of the mandamus proceedings. Doc # 115.

Based on the fact that the court has just reappointed a lead plaintiff and lead counsel, the court lifts the stay and will allow further matters to proceed. At the December 8, 2003, status conference, the court decided that it would rule on defendants' motion to dismiss. The court determined that it would set a date for further hearing on the motion and that, if the court ruled on the motion before that date, the hearing would be converted to a status conference.

The parties are currently scheduled to appear for a hearing or status conference on Thursday, February 19, 2004, at 2:00 pm. Because the parties agreed to this date at the December 8, 2003, status conference, and because the motion to dismiss is fully briefed, scheduling the hearing and/or status conference for the February 19 date seems appropriate. Accordingly, the court ORDERS that the parties appear before the court for either a motion hearing or a status conference on Thursday, February 19, 2004, at 2:00 pm.

## III

In sum, the court GRANTS Barton's application to be appointed lead plaintiff in this matter. The court ORDERS that the parties appear for a hearing on the motion to dismiss or a status conference on Thursday, February 19, 2004, at 2:00 pm.

And so concludes our tale. The moral of this story will be left to you, dear readers.

IT IS SO ORDERED.