LIU, J.,
Concurring.—Appellant David Brennan devotes the lion’s share of his briefing to issues beyond today’s holding that trial courts may use the percentage method instead of the lodestar method to award attorneys’ fees from a common fund. He argues that the lodestar method as applied does not comply with Serrano v. Priest (1977) 20 Cal.3d 25 [141 Cal.Rptr. 315, 569 P.2d 1303] (Serrano III); that courts demand too little documentation of attorney hours and do not subject such documentation to careful scrutiny; that named plaintiffs do not adequately monitor class counsel; and that courts using the percentage method, including the trial court in this case, have applied percentage numbers drawn from individual contingent fee cases without taking into account the economies of scale in class representation. To remedy these alleged abuses, Brennan urges us to explicitly state the requirements of the lodestar methodology, to require appointment of class guardians to protect absent class members through adversarial representation, and to appoint fee experts for absent class members where class counsel retains such an expert.
Although the court declines to address these arguments, I write separately to suggest practices that may help to promote accuracy, transparency, and public confidence in the awarding of attorneys’ fees in class action litigation.
First and foremost, although disputes over attorneys’ fees often arise in the context of a proposed settlement as in this case, courts and litigants need not and generally should not wait until the end of litigation to set the terms of attorney compensation. Whenever possible, the parties should negotiate, and the court should review and conditionally approve, the terms of attorney compensation at the start of litigation. The parties and the court may revisit the arrangement when the litigation concludes, and the court may make adjustments if unusual or unforeseen circumstances render the initial terms *507 clearly unreasonable or unfair. But in general, the parties’ initial bargain should be given substantial weight in determining the reasonableness of a fee award.
The Task Force on Selection of Class Counsel convened by the United States Court of Appeals for the Third Circuit has endorsed a version of this approach. While acknowledging that “a precise ex ante determination of fees is usually unworkable,” the task force recommended that ‘“the topic of attorney fees should be addressed at the early stages of the case as well as throughout the prosecution of the case. At the outset of the case, the court may be well-advised to direct counsel to propose the terms for a potential award of fees; the potential fees might be established within ranges, with the court making it clear to the parties that the fee remains open for further review for reasonableness. A preliminary fee arrangement may provide a helpful structure for the court when it conducts its reasonableness review at the end of the case.” (Third Circuit Task Force, Selection of Class Counsel (2002), 208 F.R.D. 340, 420-421, fns. omitted (Task Force Report); see Baker et al., Is the Price Right? An Empirical Study of Fee-Setting in Securities Class Actions (2015) 115 Colum. L.Rev. 1371, 1432 (Baker et al.) [recommending ex ante fee arrangements for class actions governed by the federal Private Securities Litigation Reform Act of 1995 (PSLRA; Pub.L. No. 104-67 (Dec. 22, 1995) 109 Stat. 737) and urging that ‘“the district court should apply the agreed terms unless unforeseen developments have rendered those terms clearly excessive or unfair”].)
This approach has doctrinal and practical virtues. Doctrinally, a court’s authority to award attorneys’ fees from a common fund stems from its equitable power to prevent unjust enrichment. (See Serrano v. Unruh (1982) 32 Cal.3d 621, 627 [186 Cal.Rptr. 754, 652 P.2d 985] [the ‘“central theory underlying” fee awards from a common fund is “ ‘prevention of an unfair advantage to the others who are entitled to share in the fund and who should bear their share of the burden of its recovery’ ”]; Serrano III, supra, 20 Cal.3d at p. 35 [““ ‘one who expends attorneys’ fees in winning a suit which creates a fund from which others derive benefits, may require those passive beneficiaries to bear a fair sharing of the litigation costs’ ”].) But a claim for unjust enrichment typically lies where it is impractical to bargain ex ante for a good or service in an arms-length negotiation. “[W]hen it is feasible for parties to bargain, restitution is typically denied to providers who confer benefits without negotiating for payment in advance.” (Silver, A Restitutionary Theory of Attorneys’ Fees in Class Actions (1991) 76 Cornell L.Rev. 656, 667.) ‘“The effect of withholding compensation in contexts where parties can bargain is to demonstrate a preference for voluntary exchange.” (Id. at p. 669.)
As a practical matter, “[t]he best time to determine [the rate of attorney compensation] is the beginning of the case, not the end (when hindsight alters *508 the perception of the suit’s riskiness, and sunk costs make it impossible for the lawyers to walk away if the fee is too low). This is what happens in actual markets. Individual clients and their lawyers never wait until after recovery is secured to contract for fees. They strike their bargains before work begins. Ethically lawyers must do this, but the same thing happens in markets for other professional services with different (or no) ethical codes. . . . Only ex ante can bargaining occur in the shadow of the litigation’s uncertainty; only ex ante can the costs and benefits of particular systems and risk multipliers be assessed intelligently. Before the litigation occurs, a judge can design a fee structure that emulates the incentives a private client would put in place. At the same time, both counsel and class members can decide whether it is worthwhile to proceed with that compensation system in place.” (In re Synthroid Marketing Litigation (7th Cir. 2001) 264 F.3d 712, 718-719.) Empirical evidence suggests that ex ante fee negotiation is a key mechanism for reducing agency costs between counsel and the class they represent. (See Baker et al., supra, 115 Colum. L.Rev. at p. 1394 [studying 431 securities class action settlements from 2007 through 2012, and finding that ‘“fee agreements negotiated at the beginning of cases have a substantial moderating effect on fee requests” where public pension funds act as lead plaintiffs].)
Moreover, ex ante fee arrangements do not present the conflict of interest that inherently arises when attorneys seek fees from a common fund comprising their clients’ recovery. “At the start of litigation, there is no money to divide. There is only the prospect of forming a joint venture between a client and a lawyer that seeks to maximize the parties’ joint wealth by offering the lawyer compensation terms that will motivate the lawyer to work hard on behalf of the client. [¶] When fees are set at the end of litigation, by contrast, the amount to be recovered is already known. This heightens the conflict between the client and the attorney because every additional dollar for one means a dollar less for the other.” (Baker et al., supra, 115 Colum. L.Rev. at p. 1440.)
Opponents of ex ante fee agreements in the class action context have argued that (1) there is no “functioning market” for plaintiffs’ representation and thus no reliable benchmarks that can provide a “general solution to the problem of market failure in setting class counsel fees” (ABA Tort Trial and Insurance Practice Section, Report on Contingent Fees in Class Action Litigation (2006) 25 Rev.Litig. 459, 481, 482); (2) at the early stages of class action litigation, there are too many uncertainties for bargaining to occur (id. at p. 482); and (3) if fee arrangements are disclosed to defendants, this might disadvantage plaintiffs in settlement negotiations (Baker et al., supra, 115 Colum. L.Rev. at p. 1436).
As to the first point, courts evaluating ex ante fee arrangements may use “a simple benchmark: the percentage or range of percentages prevailing in the *509 private market in similar contingent fee representations.” (Silver, Dissent from Recommendation to Set Fees Ex Post (2006) 25 Rev.Litig. 497, 499.) ‘“Plaintiffs have formed voluntary groups in mass accident cases, pollution cases, defective product cases, securities fraud cases, and cases of other kinds. Associations, including homeowners’ associations, interest groups, unions, partnerships, and corporations have sued on behalf of their members or owners thousands of times. ... All of these lawsuits are examples of aggregate litigation, and in all of them lawyers’ fees have been set ex ante via negotiations.” (Id. at pp. 499-500; see In re Synthroid Marketing Litigation, supra, 264 F.3d at p. 719 [‘“[A] court can learn about similar bargains. That is at least a starting point.”].)
As to the second point, the principal virtue of an ex ante fee arrangement is its allocation of risk between attorney and client in the face of litigation uncertainty. At the end of litigation, when the amount of recovery and the outcomes of all other uncertainties are known, perceptions of risk are likely to be distorted by hindsight bias. (Baker et al., supra, 115 Colum. L.Rev. at pp. 1441-1444.) Uncertainty is the very reason why it is appropriate for negotiations over fees to occur at the start of litigation; the market price for legal services can be more accurately derived through bargaining behind the veil of ignorance. (In re Synthroid Marketing Litigation, supra, 264 F.3d at p. 719.) Moreover, the initial terms set by the parties and approved by the court are not etched in stone; as noted, the court may make adjustments if unusual or unforeseen circumstances render the initial arrangement clearly unreasonable or unfair.
As to the third point, concerns about disclosure can be alleviated by allowing plaintiffs and class counsel to submit their fee arrangements to the court under seal or “by discussing fees with class counsel in chambers on an ex parte basis.” (Baker et al., supra, 115 Colum. F.Rev. at p. 1437.) Such approaches pose no unfairness to defendants, who “are indifferent to fee requests because the fees are paid out of the common fund.” (Id. at p. 1419.)
Quite apart from the concerns above, a significant practical challenge to negotiating attorneys’ fees in many class actions, whether at the start or end of litigation, is the lack of an active and interested class representative who can effectively bargain with and monitor plaintiffs’ counsel. Some class actions, such as securities litigation, have managed to attract large institutional investors as lead plaintiffs. In that role, they closely evaluate and choose high-quality lawyers, and they actively bargain for favorable fee structures and secure ex ante fee arrangements more often than do other lead plaintiffs. (Baker et al., supra, 115 Colum. F.Rev. at pp. 1393-1394; see 15 U.S.C. § 78u-4(a)(3) [establishing process for appointment of lead plaintiff in class actions governed by the PSFRA].) By contrast, consumer class actions *510 and wage-and-hour disputes often lack a class representative with sufficient incentive, resources, or expertise to negotiate with class counsel. Moreover, although Brennan came forward in this case as an objector, class objectors are too rare to be generally relied upon to monitor class counsel. (Eisenberg & Miller, The Role of Opt-Outs and Objectors in Class Action Litigation: Theoretical and Empirical Issues (2004) 57 Vand. L.Rev. 1529, 1549 [“Across all case types, ... the median objection rate is zero and the mean is 1.1 percent of class members.”].) And the few who do object have had little to no demonstrable impact on attorneys’ fees or settlement amounts. (Id. at p. 1563 [“We found no significant association between the number of dissenters and either the gross fee or the fee as a percentage of class recovery.”].)
Although trial courts can exercise vigilance to ensure fairness in fee negotiations, doing so puts the judge in the position of “a fiduciary guarding the rights of absent class members” (In re Cendant Corp. Litigation (3d Cir. 2001) 264 F.3d 201, 231) while at the same time serving as a neutral arbiter of counsel’s claims concerning the reasonableness of a proposed award. As Brennan puts it, the trial judge is asked “to simultaneously assume the conflicting roles of impartial judge and class advocate.”
In many cases, trial courts may have no choice but to walk the fine fine between protecting the interests of absent class members and impartially evaluating the reasonableness of a proposed fee award. In cases involving substantial sums, however, trial courts may take steps to insulate themselves from apparent conflicts by appointing a class guardian or “devil’s advocate” so that arguments for and against the reasonableness of a fee arrangement may be presented in a genuinely adversarial process. (Cf. Rubenstein, The Fairness Hearing: Adversarial and Regulatory Approaches (2006) 53 UCLA L.Rev. 1435, 1454 [proposing court-designated attorney to serve as “devil’s advocate” in evaluating class action settlements].) The class guardian would provide counterpoints to class counsel’s arguments concerning the risks and difficulty of litigating the case. Perhaps most importantly, the class guardian or a fee expert retained by the guardian would provide information on prevailing market rates for similar litigation. The appointment of a guardian and a full-dress adversarial process would cost money (from the common fund) and time. But these costs, which would serve to enhance the accuracy and legitimacy of fee awards, would “pale[] in comparison to the significant amounts of money” to be divided between plaintiffs and counsel in high-value cases. (Id. at p. 1455.)
*511 *
The suggestions above reflect the importance of fairness and reasonableness in attorney compensation. Ensuring “objectivity” in attorney compensation “ ‘is obviously vital to the prestige of the bar and the courts.’ ” (Serrano III, supra, 20 Cal.3d at p. 48, fn. 23.) Moreover, “[pjrobably to a unique degree, American law relies upon private litigants to enforce substantive provisions of law that in other legal systems are left largely to the discretion of public enforcement agencies. . . . The key legal rules that make the private attorney general a reality in American law today . . . [are] those rules that establish the fee arrangements under which these plaintiffs attorneys are compensated. Inevitably, these rules create an incentive structure that either encourages or chills private enforcement of law.” (Coffee, Understanding the Plaintiff’s Attorney: The Implications of Economic Theory for Private Enforcement of Law Through Class and Derivative Actions (1986) 86 Colum. L.Rev. 669, 669-670, fns. omitted (Coffee).) “By setting fees too high or too low, judges would incentivize lawyers to bring too many class actions or too few. Excessive litigation would over-deter primary conduct that is desirable; insufficient litigation would under-deter primary conduct that is unwanted.” (Baker et al., supra, 115 Colum. L.Rev. at p. 1375.)
It must be acknowledged that “there is a perception among a significant part of the non-lawyer population and even among lawyers and judges that the risk premium is too high in class action cases and that class action plaintiffs’ lawyers are overcompensated for the work that they do.” (Task Force Rep., supra, 208 F.R.D. at pp. 343-344.) I express no view on the degree to which this perception is anchored in reality. (Compare Task Force Rep., supra, 208 F.R.D. at p. 344 [“When there is a public reaction to an attorney fee award in a given case, the public is usually unaware of what the lawyers actually did, what risks they took, what investment they made, and how important their lawyering was to victory for the class.”] with Coffee, supra, 86 Colum. L.Rev. at p. 714 [“At its worst, the settlement process may amount to a covert exchange of a cheap settlement for a high award of attorney’s fees.”].) But the perception itself may prompt some judges and policymakers to respond by narrowing substantive legal protections or by curtailing procedural mechanisms of enforcement.
Public confidence in the fairness of attorney compensation in class actions is vital to the proper enforcement of substantive law. Although there may be no single “right answer” to how much class counsel should earn in each case, ex ante fee arrangements with the possibility of ex post modification for unusual circumstances may provide a useful approach to estimating market rates, reducing the distortive effects of hindsight bias, and aligning the interests of counsel and the class they represent. Courts and litigants should *512 be alert to this and other approaches that may help to promote greater public confidence in a form of litigation on which many people rely to obtain effective access to justice.