**ARKANSAS TEACHER RETIREMENT SYSTEM, and Fresno County Employees' Retirement Association, Individually and on Behalf of All Others Similarly Situated, Plaintiffs,**

v.

**BANKRATE, INC., Thomas R. Evans, Edward J. Dimaria, Apax Partners L.P., Apax Partners LLP, and Apax Partners Europe Managers Ltd., Defendants.**

No. 13 Civ. 7183(JSR).

United States District Court,
S.D. New York.

Signed April 29, 2014.

Filed April 30, 2014.

John James Rizio–Hamilton, Lauren Amy Ormsbee, Rebecca Ellen Boon, Salvatore Jo Graziano, Stefanie Jill Sundel, Avi Josefson, Gerald H. Silk, Jeroen Van Kwawegen, Bernstein Litowitz Berger & Grossmann LLP, New York, NY, for Plaintiffs.

George T. Conway, III, Warren R. Stern, Lauren Marie Kofke, Wachtell, Lipton, Rosen & Katz, Mitchell A. Lowenthal, Meredith Eve Kotler, Cleary Gottlieb, New York, NY, for Defendants.

## MEMORANDUM

JED S. RAKOFF, District Judge.

Arkansas Teacher Retirement System and Fresno County Employees' Retirement Association bring this putative class action on behalf of themselves and all oth-

er similarly situated persons who purchased securities in Bankrate, Inc. ("Bankrate") between June 16, 2011 and October 15, 2012 (the "Class Period"). Plaintiffs allege that Bankrate and its then two most senior officers, CEO Thomas R. Evans and CFO Edward J. DiMaria, violated Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, by misrepresenting the quality of Bankrate's insurance "leads." Defendants moved to dismiss the complaint, contending, first, that plaintiffs failed to plead with particularity any material misstatement or omission as required by 15 U.S.C. § 78u–4(b)(1); second, that plaintiffs failed to plead particularized facts raising the strong inference of scienter required by 15 U.S.C. § 78u–4(b)(2); and third, that plaintiffs failed to state a claim for control-person liability under Section 20(a) against Apax Partners L.P., Apax Partners LLP, and Apax Partners Europe Managers Ltd. (together, the "Apax defendants"). After full briefing and oral argument, the Court, in an April 15, 2014 "bottom line" Order, granted defendants' motion only with respect to the control-person liability claim. This Memorandum sets forth the reasons for that decision.

Bankrate operates a network of consumer financial websites, earning revenue by locating potential customers of financial products and giving financial services providers access to those potential customers. Amended Complaint ("Am. Compl.") ¶¶ 26, 32. For example, as explained by defendants, a consumer might search for a particular product on Google, which might direct her to a Bankrate site; on the site, the consumer could read about mortgages and research rates in her area; if the consumer saw a rate she liked, she could click on a link to the lender's webpage and apply for a loan. *See* Defendants' Memorandum of Law in Support of their Motion to Dismiss ("Defendants' Memo.") at 4. In addition, Bankrate also locates potential customers for financial services providers by purchasing "leads" generated by affiliates for re-sale. Am. Compl. ¶ 35. Bankrate charges the financial services providers a "cost per click" fee when a consumer clicks on a provider's link, charges fees for advertising on its sites, and finally (the subject of this dispute), charges a "cost per lead" fee for information about a potential consumer. *Id.* ¶ 33.

During the Class Period, plaintiffs allege that Bankrate made material misrepresentations and omissions concerning "lead" quality. For example, during an August 10, 2011 earnings call, CEO Evans stated, in reference to Bankrate's lead quality, that "we're feeling very good about our sources of traffic .... [t]here's a lot of volume out there so you can be picky about making sure it's high-quality. I can tell you we've cut off some sources. We're constantly testing and monitoring, and I think we're doing a pretty good job of that. So I do think we have a competitive advantage." Declaration of Lauren M. Kofke date February 11, 2014 ("Kofke Decl."), Exhibit ("Ex.") 4 at 10. During the same time period that statement was made, but not disclosed until thereafter, approximately $12 million worth of Bankrate's insurance leads were determined to be of such poor quality that they could not be sold and were effectively worthless. Am. Compl. ¶ 194. Also during that period, 25% of Bankrate's largest carrier customers and 30% of its agent base stopped doing business with Bankrate. *Id.* ¶¶ 91–94.

On May 1, 2012, Bankrate reported revenues and earnings that missed expectations. *Id.* ¶ 95. On that date and thereafter, defendants took efforts to reassure investors that Bankrate was aggressively dealing with its lead quality problem. For

example, on a July 31, 2012 earnings call, Evans stated that "[t]he initiative that we undertook to improve the quality and conversion of our leads and clicks is showing measurable improvements .... [w]e've seen meaningful results. The carriers that are providing actual data back to us have seen improvements over the past nine months from 25% to as high as 45% in [areas such as] conversion rates. And it pays off not only in better converting leads, but in better agent retention as well. And as a result we've been able to negotiate higher prices.... While there's more to do, we're pleased that the effort is absolutely on track." *Id.* ¶ 206. The day after these statements were made, the price of Bankrate stock increased by 10%. *Id.* ¶ 216. In actuality, however, the quality of a substantial portion of Bankrate's leads remained abysmally low, with the result that on October 15, 2012, Bankrate announced that it had been forced to eliminate more than 40% of its insurance leads because of poor quality. *Id.* ¶ 196. On October 16, 2012, the first trading day after that announcement, Bankrate's stock price declined 22%. *Id.* ¶ 118.

■ Under the Private Securities Litigation Reform Act ("PSLRA"), a class action plaintiff alleging a violation of Rule 10b–5 must allege particularized facts showing, *inter alia,* that "the defendant ... made a materially false statement or omitted a material fact," *ECA Local 134 IBEW Joint Pension Trust v. JP Morgan Chase Co.,* 553 F.3d 187, 197 (2d Cir.2009), and that the inference that the defendant did so with "scienter" (i.e., fraudulent intent) is "cogent and at least as compelling as any opposing inference of non-fraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 314, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007).

■ With regard to the first requirement, defendants allege that the complaint fails to plead any material misstatement or omission of fact because generalized expressions such as "high quality" are puffery and thus are inactionable in the Second Circuit. *See, e.g., ECA, Local 134 IBEW Joint Pension Trust v. JP Morgan Chase Co.,* 553 F.3d 187, 197 (2d Cir.2009). But while a term like "high quality" might be mere puffery or insufficiently specific to support liability in some contexts, it is clearly a material misrepresentation when applied to assets that are entirely worthless, as were large percentages of Bankrate's leads. Moreover, Evans and DiMaria continually assured investors that, even though their insurance leads were already of higher quality than their competitors, Bankrate was taking even further steps to improve lead quality—a completely misleading description of what, according to the complaint, was actually going on, *viz.,* the company was writing off as worthless large portions of its inventory of leads. Thus, despite announcing alleged "improvements ... from 25% to as high as 45% in conversion rates," Am. Compl. ¶ 206; defendants were forced to eliminate more than 40% of Bankrate's insurance leads due to poor quality only two months later, *id.* ¶ 118. The Court therefore finds that plaintiffs have adequately pled a material misstatement or omission sufficient to survive defendants' motion to dismiss.

■ With regard to the second requirement, defendants contend that plaintiffs' allegations are insufficient to give rise to a strong inference of either the fraudulent intent or the conscious recklessness required to plead scienter. *See South Cherry Street, LLC v. Hennessee Group LLC,* 573 F.3d 98, 108–09 (2d Cir.2009). Recklessness in this context requires action that "is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that *the danger was either known*

to the defendant or so obvious that the defendant must have been aware of it." *Id.* at 109 (emphasis in the original). Here, the danger was both known and obvious. Knowledge of insurance lead quality problems resulting from a high volume of low quality leads was well-publicized by other companies such as QuinStreet, and widespread in the industry. Am. Compl. ¶ 168. Bankrate's own inventory of leads was so typical of this problem that the company had to write off a very large proportion of such leads as worthless. Yet, Bankrate and its senior management, though not only aware of the industry's problems but also personally involved in directing hands-on efforts to improve Bankrate's lead quality, argue that they were somehow oblivious to Bankrate's own severe problems. Kofke Decl., Ex. 17 at 3. Such a supposition is both implausible and unsupported by anything in the pleadings. Thus the strong plausible inference of scienter remains intact.

■ However, as to control-person liability, the Amended Complaint does fail to state a claim under Section 20(a) against the Apax defendants. To state such a claim, plaintiffs must allege (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in a meaningful sense, a culpable participant in the controlled person's fraud. *See, e.g., SEC v. First Jersey Sec., Inc.,* 101 F.3d 1450, 1472 (2d Cir.1996). Here, the third prong is not satisfied. Plaintiff's amended complaint alleges that (1) throughout the Class Period, Apax always controlled more than 50% of Bankrate's stock, Am. Compl. ¶ 267; and (2) that Apax had four sitting representatives on Bankrate's seven person board, *id.* ¶ 268. However, to satisfy a Section 20(b) claim, the "defendant must not only have actual control over the primary violator, but have 'actual control over

the *transaction* in question.'" *In re Alstom SA Sec. Litig.,* 406 F.Supp.2d 433, 487 (S.D.N.Y.2005) (emphasis in original) (quoting *In re Global Crossing Ltd. Sec. Litig.,* No. 02–cv–910, 2005 WL 1875445, at *3 (S.D.N.Y. Aug. 5, 2005)). The Amended Complaint has alleged no particularized facts suggesting that the Apax entities had control over the alleged misrepresentations at issue in this case. Am. Compl. ¶¶ 31, 267–69.

Accordingly, for the foregoing reasons, the Court by its Order of April 15, 2014, granted defendants' motion in part and denied it in part.